**Case No. 11-15185-BB**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

**UNITED STATES OF AMERICA**,

Appellee,

v.

**NATHAN ALLEN RAILEY**,

Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
DISTRICT COURT NO.: 10-00266-CG

_____

BRIEF FOR THE APPELLANT

_____

ARTHUR J. MADDEN, III
Madden & Soto
Attorney for Appellant
465 Dauphin Street
Mobile, Alabama 36602
(251) 432-0380
(251) 433-5964 (fax)

United States v. Nathan Allen Railey, No. 11-15185-BB

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Counsel hereby certifies that the following have an interest in the outcome of this case:

(a) Brinson, Christopher B., Esq. Assistant United States Attorney

(b) Brown, Kenyon, Esq., United States Attorney, Southern District of Alabama

(c) Butler, Charles R, Senior States District Judge

(d) Costello, Sean P., Esq., Assistant United States Attorney

(e) Dearman, Henry Chase, Esq., trial counsel for Appellant

(f) Granade, Callie V. S., United States District Judge

(g) Madden, III, Arthur J., Esq., attorney for appellant

(h) Madden & Soto, a partnership

(i) Murphy, Maria E., Esq., Assistant United States Attorney

(j) Pierce, Brenda J., guardian ad litem

(k) Railey, Nathan, appellant

(l) Soto, Domingo, Esq., partner, Madden & Soto

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested to further discuss the facts relating to misstatements in the search warrant affidavit which were crucial to the probable cause determination and the inapplicability of the *Leon* good faith exception.

## CERTIFICATE OF TYPE SIZE AND STYLE

The fixed width font "Times New Roman" in 14 point has been used throughout this brief.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . .ii

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . iii

CERTIFICATE OF SIZE AND STYLE OF TYPE. . . . . . . . . . . . . . . . . iii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

TABLE OF RECORD REFERENCES. . . . . . . . . . . . . . . . . . . . . . . . . .vi

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . .vii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW. . . . . . . . . .1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

      1.    COURSE OF THE PROCEEDINGS. . . . . . . . . . . . . . . . . . .2
      2.    STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . 4
      3.    STATEMENT OF THE STANDARD OF REVIEW. . . . . . . 16

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT AND CITATIONS OF AUTHORITY. . . . . . . . . . . . . . . . 17

     WHETHER THE DISTRICT COURT ERRED IN FAILING
     TO EXCLUDE FROM USE IN EVIDENCE IMAGES FOUND
     ON A COMPUTER SEIZED FROM THE APPELLANT WHERE
     PROBABLE CAUSE FOR ISSUANCE OF THE SEARCH
     WARRANT WAS A FALSE, DEFECTIVE AFFIDAVIT?

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

## <u>TABLE OF CITATIONS</u>

CASES

*Franks v. Delaware*, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . .16, 18, 20

*Illinois v. Gates*, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

FEDERAL STATUTES

*United States v. Kapordelis,* 569 F.3d 1291 (11th Cir.2009). . . . . . . . . . . . 22

*United States v. Leon,* 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . .17, 23

*United States v. Martin,* 297 F.3d 1308 (11th Cir.2002). . . . . . . . . . . . 16, 23

*United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . 20

*United States v. Tate,* 586 F.3d 936 (11th Cir.2009) . . . . . . . . . . . . . . . . . .16

SENTENCING GUIDELINES

18 U.S.C. § 3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vii

18 U.S.C. §2251(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. §2252(a)(5)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

 28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

TABLE OF RECORD REFERENCES IN THE BRIEF

| Brief Page # | | Record # |
|---|---|---|
| *Passim* | Motion to Suppress | 73* |
| 4 | Government's Response | 80 |
| 4, 5 | Affidavit | 81-2* |
| 2 | Second Superceding Indictment | 88 |
| 2, 4, 6, 17, 22 | Order | 99 |
| 3 | Order | 154 |
| 3 | Defendant's Objection | 166 |
| 3 | PSR | 167* |
| 3 | Addendum to PSR | 168* |
| 3 | Judgment | 174 |
| 3 | Notice of Appeal | 177 |
| 6 | Trial Transcript – Day One | 198 |
| 10, 14 | Trial Transcript – Day Two | 199 |
| 2, 4, 5, 6, 18 | Hearing Transcript | 203 |
| 7, 13, 14 | Trial Transcript – Day Three | 204 |
| 9 | Trial Transcript – Day Five | 205 |

* filed separately under seal

## STATEMENT OF JURISDICTION

This is a direct appeal from a conviction and sentence in a criminal case. Judgment was entered October 31, 2011 in the United States District Court for the Southern District of Alabama and notice of appeal was filed on November 4, 2011. This Court has jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

<u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

WHETHER THE DISTRICT COURT ERRED IN FAILING TO EXCLUDE FROM USE IN EVIDENCE IMAGES FOUND ON A COMPUTER SEIZED FROM THE APPELLANT WHERE PROBABLE CAUSE FOR ISSUANCE OF THE SEARCH WARRANT WAS A FALSE, DEFECTIVE AFFIDAVIT?

## STATEMENT OF THE CASE

### 1.  COURSE OF THE PROCEEDINGS

Nathan Allen Railey (sometimes referred to as "Defendant" or "Appellant") was indicted by the October 2010 Grand Jury for the Southern District of Alabama. The indictment was superseded on January 27, 2011 and then again on February 24, 2012. The case proceeded to trial on a five count second superseding indictment. (Doc. 88) Four counts charged violations of 18 U.S.C. §2251(b)(parent or custodial figure encouraging sexually explicit conduct by a minor for the purpose of producing a visual depiction using materials shipped in interstate commerce) . The fifth count alleged possession of child pornography, in violation of 18 U.S.C. §2252(a)(5)(B). (Doc. 88)

Railey was arraigned on the second superseding indictment on March 2, 2011 and pleaded not guilty. On March 14, 2011, the court conducted an evidentiary hearing on the motion to suppress. (Doc. 73) (Doc. 203 hearing transcript). The court found the search warrant was issued without probable cause but denied the motion to suppress on *Leon* good faith grounds. (Doc. 99)

A jury was selected on June 27, 2012 and trial commenced on July 14, 2011. The government rested on July 18, 2011. The defendant's oral motion

2

for judgment of acquittal at the close of the evidence was denied. The defendant presented his case and the government concluded with rebuttal, after which the motion for judgment of acquittal was renewed. The matter went to the jury on July 19, 2011 and the jury returned a verdict of guilty on all counts. (Doc. 154)

A pre-sentence report was prepared (Doc 167, sealed PSR included with expanded record excerpts.) and the defendant interposed objections. (Doc. 166). The pre-sentence report suggested a grouped base offense level of 43, a criminal history category of I, with a guideline sentencing range of life imprisonment.   Railey's objections TO the PSR are reflected in the addendum to the pre-sentence report. (Doc. 168 included with sealed PSR)

Railey was sentenced on October 26, 2011 to a term of 360 months imprisonment on counts one and two to be served concurrently, with that sentence to be served consecutively to 180 month terms of imprisonment on counts three and four, finally a 60 month term of imprisonment was imposed on count 5 to be served consecutively to the terms in counts one through four.  The court also imposed concurrent life terms of supervised release on counts one through five.  A special assessment of $500.00 was imposed. (Doc. 174) Railey filed timely notice of appeal. (Doc. 177)  He is incarcerated.

## 2.  STATEMENT OF THE FACTS

*The Suppression hearing*

On August 18, 2010 Mobile Police Detective Latonya Thompson obtained a search warrant from Mobile County District Court Judge Charles McKnight to search the home of appellant's brother, Curtis Railey. (Doc 81-2)[1] The search warrant was executed the same day and resulted in the seizure of the appellant's laptop computer and other computer and electronic equipment. Subsequent forensic analysis revealed the presence of both commercial and homemade child pornography in the unallocated space of the laptop computer's hard drive. Those images, admitted at trial, formed the basis of the convictions.

Railey filed a motion to suppress the items seized in the search. (Doc. 73). An evidentiary hearing on the motion was held on March 14, 2012.[2] (Doc. 203 - transcript)

Detective Tonya testified at the suppression hearing that she prepared the affidavit setting out probable cause for issuance of the search warrant and presented it to the state court judge. (Doc. 203 p 15) The affidavit states:

---

[1] The motion to suppress (Doc. 73 and attachments),and exhibits submitted by the government in its response to the motion (Doc 80) including the affidavit in support of the search warrant, were filed under seal. These documents are included as sealed documents in the record on appeal in this court.

[2] Senior District Judge Charles Butler presided over the hearing on the motion to suppress and entered the order denying the motion. (Doc. 99)

"On August 15, 2010, I responded to [L.T.'s address]. Upon my arrival I spoke with L.T. who identified herself as the biological mother of C.T. and K.T. L.T. said she discovered an ink pen camera in her daughter's bathroom, and the ink pen camera was placed inside a toothbrush holder which was cut for better visibility. L.T. stated she spoke with her daughters and they both stated that their step-father, Nathan Railey[,] touched them on their vaginal area and rear-end inside and out side of their clothes. L.T. went on to say that both daughters disclosed that the abuse had been going on for awhile.

"I spoke with nine-year-old C.T. and she advised that her step-father, Nathan Railey[,] put his hands inside of her underwear touching her vagina. She advised this happen [sic] in June while she was home alone with Mr. Railey and the abuse continued.

"I then spoke with thirteen-year-old [K.T] who advised that her step-father, Nathan Railey[,] would touch her on her vagina, breast and rear-end inside of clothing. She also said the abuse started at the end last school year. [sic]

"L.T. said that she could not find the recording device for the ink pen camera and believes that Mr. Railey may have photographs of her children. She advised that Mr. Railey is a Computer Software Engineer and in their home they have a desk top computer and a laptop that Mr. Railey uses as well.

"Mr. Railey has since moved from L.T.'s residence and is now living with his brother Curtis Railey at 4020 Sedgewick Court Mobile, Alabama 36693.

'I am requesting a search and seize [sic] of any electronic storage devices or computers located at 4020 Sedgewick Ct.'

(Doc. 81-2)

The state court judge accepted Detective Thompson's affidavit without change and issued the warrant. (Doc. 203, p. 21) Thompson testified at the suppression hearing that she was told that the toothbrush

holder "was found in the mother's bedroom" not in the bathroom with the

pen camera. (Doc 203, p. 48) Thompson testified that she had "just

assumed" that the toothbrush holder had been cut  so as to afford the pen

camera better visibility even though she did not know where the pen camera

lens was located. (*Id.* p. 9, 48)

The motion to suppress was denied. (Doc. 99)

*Facts at trial*

LeMenda Tanner testified that she has two daughters K. age 14 and C.

age 10.  (Doc. 198, p. 114-116)  Sometime around April 2009 Ms. Tanner

met the defendant.  At some point in 2009 Railey moved into the home with

Tanner and her daughters.  (*Id.* p. 119 -20) On July 16, 2010 Tanner and

Railey married.  (*Id.* p. 122)  On the day of their wedding, Tanner and Railey

went to a store which sold security equipment where he purchased a pen

camera. Tanner understood the camera was to be used by Railey in a custody

fight with his ex-wife.  (*Id.* p. 123)  Railey demonstrated for her how the

camera functioned.  (*Id.* p. 139)

Tanner testified that Railey worked with his brother developing

computer software and he had flexible hours, working mostly from home.

He would pick up the girls after school and tend to them until Ms. Tanner

returned from work.  (*Id.* p. 122)

Tanner testified that on August 13, 2010 when she returned from work, Railey was asleep in the master bedroom. Rather than disturb him she used the girl's bathroom which was located at the other end of the house. (*Id.* p. 136) Tanner's attention was drawn to an object sticking out of a makeup bag which was placed on the back of the toilet. The object was the top half of the pen camera – the recording portion – and the lens was facing the shower. (*Id.* p 138, 140) Tanner plugged the pen camera into a computer using a USB cable and determined that nothing was recorded on it. (*Id.* p. 140; 171-173)

Tanner was furious at the thought that Railey had videoed the girls and confronted him. Railey explained that he was tinkering with the pen camera in the girl's bathroom and put it in the makeup bag so it wouldn't get wet. Tanner told Railey to get his things and leave, which he did, taking with him his laptop computer and other electronics, including the recording portion of the pen camera which Tanner put in his belongings. (*Id.* p. 141-42)

Over the next few days Railey communicated with Tanner by text message. She kept the messages and showed them to Detective Thompson, who transcribed the text and had photographs made of the phone screen as the messages where depicted. (*Id.* p. 141-42; Doc. 204 p. 571-72)

7

Tanner testified that she had previously seen a toothbrush holder on top of a chest of drawers in the master bedroom and later found the toothbrush holder in the bathroom drawer where Railey kept his toothbrush. The holder had a hole cut out of it. She turned the holder over to police. (*Id.* p. 148) In a text message Tanner accused Railey of trying to photograph the girls using the toothbrush holder to conceal a camera. Railey explained in a reply text message that he had cut the toothbrush holder because the toothbrush wouldn't fit in it. (*Id.*)

Over the weekend Tanner spoke with her girls about their interaction with Railey. K., the 13 year old, told Tanner that Railey "touched her in her private parts. She confessed that he kissed down there. She confessed that he rubbed his penis on her vagina." (*Id.* 161) Ten year old C. also indicated she had been abused by Railey. (*Id.* 182)

On Sunday night, August 15, 2010 Tanner called the police to report her suspicions of sexual abuse. (*Id.* p. 187) Mobile Police Detective Latonya Thompson, took a statement from Tanner and then spoke privately with each of the girls. (*Id.* p. 198-200)

After Railey left he communicated with Tanner by text message. (*Id.* p. 704-705) She kept the messages and showed them to Detective

Thompson, who transcribed the text and had photographs made of the phone screen as the messages where depicted. (*Id.* p. 141-42; 571-72)

Tanner testified that in one of the text messages "Railey admitted that he had touched [nine year old] C. a long time ago. He said he stopped because he knew it was wrong and it hadn't happened in a long time and he said that if he was a pedophile then he would have done something to K. He pleaded with me to take him back." (*Id.* p. 153-154) Tanner also testified that in one of the texts Railey said that C., the nine year old, was "no angel" and that "she came on to him and that's how it started." (*Id.* p. 159)

A message dated August 15 at 12:21 p.m. stated "Ok I have thought about this a long while. And my side of the story has to come out. It didn't start out with me rubbing her. It started out accidental. She started wanting it and I would deny it and she would treat me like shit when I did that. It only happened a few times and not the many she claims. One day I asked her if it bothered her … and she said yes. And I said it would never happen again and it didn't. And that was many months ago, like right after we moved in..." (Doc. 205 p. 711-712)

On August 18, 2010 a search warrant was executed at Curtis Railey's home on Sedgwick Court. Curtis Railey is appellant's brother. Seized in the search was appellant's lap top computer and other computer and electronic

equipment.)   The computer equipment was sent for forensic analysis. (Doc.199 p. 245)

The laptop computer seized in the search was subject to forensic examination by four experts, three called by the government and one by the defendant. All four of the experts testified that they found images of child pornography in the unallocated space on the lap top hard drive.

Foley Police Department Corporal Eric Waldrep testified as an expert in digital evidence investigations. He testified that the operating system for the computer, Windows 7 Ultimate, was installed on August 17, 2010, but using licensed forensic tools products provided by the United States Secret Service he was able to retrieve data in unallocated disc space which had been on the computer prior to the reinstallation.  (*Id.* p. 281-284)  He found the user name for the system was esynceme a domain name registered to Nathan Railey.  (*Id.* p. 267, 270 -80)  He also found a resume belonging Nathan Railey and emails, court paperwork, an airline ticket, and personal correspondence associated with Railey.  (*Id.* p. 296)  He did not find any use of the machine by other individuals.  (*Id.*)

Waldrep testified that he could not access the photographs in the unallocated space without the specialized forensic software but with the software he was able to recover over 600 images.  Most of the images were

commercial child pornography some of which he had previously

encountered in his work. Thirty six images appeared to be homemade

photographs taken with a Kodak camera. (*Id.* p. 286; 290-291; 307-308)

FBI agent Marya Wilkerson identified photographs which were taken

of Mr. Railey's hands for purposes of comparison.  These exemplar hand

photographs were sent to FBI forensics analyst Chris Iber, along with a

Kodak EasyShare M853 camera which belonged to Ms. Tanner and the

homemade photographs recovered from the laptop computer, (*Id.* p. 331-

332)

Iber testified as an expert in digital image analysis that he compared

exemplar photographs of Railey's hands to the images of hands seen in the

homemade photographs on the laptop computer.  He looked at scars and hair

patterns on the hands and concluded "that the hand[s] appeared to be the

same," but could not say the hand in the homemade photograph was that of

Railey to the exclusion of all other hands.  (*Id.* p. 336-338; 341; 348-349;

364-365)

Iber also testified that he located a serial number in the metadata of

the photographs on the laptop which corresponded with the serial number of

the Tanner Kodak camera.  (*Id.* p. 356-357)  He concluded that the

homemade images found on the unallocated space of the laptop computer were taken with the Tanner Kodak camera. (*Id.* p. 353-354)

Iber also testified that he compared the unique variations in the charge coupling device (CCD) of the Tanner Kodak EasyShare camera with the images on the laptop and concluded through use of FINDCamera software that the homemade photographs on the laptop were taken with the Tanner Kodak camera. (*Id.* p. 361-362) Iber testified that the FINDCamera software was not commercially available and that he did not know the mathematics of the underlying algorithm employed by the software. (*Id.* p. 366-369) Iber had not read any articles concerning the FINDCamera software and had only been told that reviews of the methodology had been published. (*Id.* p. 370-371)

Konstantinos Dimitrelos testified as an expert in digital forensic examination that he examined the data on hard drive from the laptop computer. He determined that the operating system had been installed on the laptop on August 17, 2010 but that prior files remained in the unallocated space. (*Id.* p. 386-387) Dimitrelos testified that from his examination of the contents on the hard drive that the user of the computer was Nathan Railey. (*Id.* p. 389-390; 655-56) Dimitrelos testified there were two types of child pornographic images recovered from the lap top

hard drive. One type was commercially available pornography and the other type was homemade. (*Id.* p. 393) Dimitrelos testified that from examination of the metadata on the homemade images he was able to determine the images were produced by Tanner's Kodak digital camera. (*Id.* p. 408)

K., age 14, testified that in May or June of 2009 Railey began to touch her inappropriately. Initially the contact seemed incidental and humorous but progressed to oral sexual contact. (Doc. 204 p. 424-428) In the first interview with the detective K. denied any sexual contact. (*Id.* p. 439) In later reports her description of the abuse was more extensive and detailed. (*Id.*)

C., testified when she was 10 years old Railey began dating her mother. At some point he touched her on the vagina. (*Id.* p. 450) She identified a hand made blue blanket which she slept with every night. She also testified that she kept her fingernails long and polished different colors. (*Id.* p. 452-453)

FBI Special Agent Maria Wilkerson testified she reviewed with Tanner the homemade photographs which had been recovered from the laptop computer. The pictures were viewed on a laptop computer and the agent also displayed photographs which had been printed out. Wilkerson

13

identified objects in the photographs including blanket, a hand, and fingernail polish. (Doc. 199 p. 364-368)

Curtis Railey, the defendant's brother, testified that Nathan Railey was working for him developing software and that he purchased the laptop in January 2010 for use by his brother in this work.  (Doc. 204 p. 490-495) He testified that Railey was the only one who used the laptop. (*Id.* p. 506-07)

Curtis Railey testified his brother worked on computers, rebuilding them and replacing hardware and that he regularly tinkered with electronics. (*Id.* p. 498)  He testified that Exhibit 1, the non-recording portion of the pen camera, was irrelevant as far as the operations of the camera.  The recording part of the camera, Exhibit 2, charges the battery, takes pictures and records audio.  (*Id.* p. 502-503)  The black tape on the pen camera covered the microphone.  (*Id.* p. 504)  Curtis Railey testified he had never seen the Tanner children acting afraid of his brother.  (*Id.* p. 505)

Wade Morgan, the owner Alabama Forensic Services, is also a Homewood Police Department corporeal. He testified as a defense expert in computer forensic investigations in his private capacity. (*Id.* p. 573, 577) He examined the hard drive taken from the laptop and found in the unallocated disc space a large number of pornographic pictures of minors. (*Id.* p. 596-99) These pictures could not be accessed without the use of special software.

14

(*Id.* p. 596)  Morgan testified that because the files in the unallocated disc space lacked metadata he could not determine who placed those images on the computer; when the photos were placed there; or the source of the pictures.  (*Id.* p. 597 -598)

Morgan also explained that Railey not only wrote software but worked on other people's computers, and those computers, when attached to Railey's, could be a source of data contamination, transferring images to Railey's computer.  (*Id.* p. 600, 602)   Morgan testified that he disagreed with the conclusion that reinstallation of the operating system to delete images on a computer was an attribute of people collecting child pornography.  Morgan explained that collect child pornography collectors are not known to delete their collections such images because such images are difficult to acquire.  (*Id.* p. 603-604)

Morgan testified that he was not afforded an opportunity to examine most of the homemade photographs.  He was only shown the ones marked 21-26 at the US Attorney's Office.  Morgan testified the quality of the pictures was poor and he could not tell what was depicted in the photographs which he did review. (*Id.* p. 609-614)

Morgan testified he could not perform the tests conducted by Chris Iber because the FINDCamera software is not available in the private sector.

(*Id.* p. 617)  Morgan testified that he did not have the training and background to conduct a forensic examination of the physical properties of the camera such as the charged coupling device.  (*Id.* p. 620)

### 3.  STATEMENT OF THE STANDARD REVIEW

A district court's denial of a motion to suppress is subject to a mixed standard of review; the court's findings of fact are reviewed for clear error, and its application of the law to those facts is reviewed *de novo*. *United States v. Tate,* 586 F.3d 936, 942 (11th Cir.2009), *cert. denied,* 131 S.Ct. 634 (2010). The appeals court reviews *de novo* the legal issue of whether the good faith exception to the exclusionary rule applies to a search warrant found to be unsupported by probable cause. The underlying facts upon which the district court's good faith determination is based are reviewed for clear error. *United States v. Martin,* 297 F.3d 1308, 1312 (11th Cir.2002).

### **SUMMARY OF THE ARGUMENT**

Evidence seized from appellant's lap top computer should have been suppressed from use in evidence because the warrant authorizing the search contained materially false statements. Once the false statements are excised from the affidavit, there is no basis for probable cause for issuance of a search warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978) While the district court correctly found the affidavit did not establish probable cause on

other grounds The court failed to address the core *Franks* issue and should

not have decided the suppression issue on the *Leon* good faith exception.

*United States v. Leon,* 468 U.S. 897, 915, (1984)

## ARGUMENT AND CITATIONS OF AUTHORITY

EVIDENCE SEIZED IN THE SEARCH OF APPELLANT'S
COMPUTER SHOULD HAVE BEEN SUPPRESSED BECAUSE THE
SEARCH WARRANT AFFIDAVIT CONTAINED MATERIAL MIS-
STATEMENTS WITHOUT WHICH THERE WAS NO PROBABLE
CAUSE. THE *LEON* GOOD FAITH EXCEPTION IS INAPPLICABLE
BECAUSE THE MISSTATEMENTS WERE DELIBERATELY FALSE.

The district court found after the suppression hearing that the search

warrant was invalid for two reasons: lack of probable cause for its issuance

and failure to describe the objects to be seized with particularity. (Doc. 99 p.

6) The court however denied the motion to suppress, finding that the *Leon*

exception to the good faith rule applied. *United States v. Leon,* 468 U.S. 897,

915, (1984) The district court was in error in the *Leon* determination, but it

was unnecessary to reach that issue because the search warrant was invalid

because it relied for probable cause on material false statements.

Key to the finding of probable cause was Detective Thompson's

statement in the search warrant affidavit that "L.T. said she discovered an

ink pen camera in her daughter's bathroom, and the ink pen camera was

placed inside a toothbrush holder which was cut for better visibility." The

suppression hearing testimony demonstrated that the core factual assertions

in this statement are false in three respects A search warrant must be voided

and the fruits of the search excluded if the affidavit supporting the search

warrant contains a false statement made knowingly and intentionally or with

reckless disregard for the truth. *Franks v. Delaware*, 438 U.S. 154, 171,

(1978)

*The false statements*

The first misstatement in the affidavit is that the L.T. found the pen

camera "placed inside the toothbrush holder" which was found in the girls'

bathroom. In fact, Detective Thompson knew from what the mother told her

that the pen camera was not found "placed inside a toothbrush holder."

Thompson testified at the suppression:

> Q. And where was that [the toothbrush holder] found or where were
> you told that was found?
> A. It was found in the mother's bedroom.
> (Doc 203, p. 11)
> Q. That pen camera and the so called tooth brush holder, they weren't
> found in the same room, were they?
> A. No, I don't think they were.
> (Doc 203, p. 48)

Not only was the pen camera not placed in the toothbrush holder, the holder

and the camera ere not even found in the same room.

18

The second mis-statement is Thompson's assertion in the affidavit that the toothbrush holder within which the pen camera was (falsely asserted to have been) placed "was cut for better visibility." Thompson testified that the toothbrush holder had a piece cut out "somewhere in the center." (*Id.* p 11) However the detective did not know where the pen camera lens was located. The cut out on the toothbrush holder would work to provide "better visibility" only if the camera's lens were aligned with the cut out. The judge at the suppression hearing asked Thompson "[s]o the lens of the pen camera is where the tip of the pen would be? If that was a pen camera? Show me where the lens would be that would take the picture." (*Id.*, p. 9)  Thompson answered "That I don't know. It's hard to explain because I don't know the technical part." (*Id.*)

Defense counsel followed up on this line of inquiry, asking:

Q. How did you know that it [the toothbrush holder]was cut for better visibility if you don't know where the camera is?
A. It was an assumption.
Q. So you just assumed?
A. Yes.
Q. But you had the instructions to the  actual pen camera with you, correct?
A. They were given to me. No, I did not read them.

(*Id.* , p. 47)

These misrepresentations in the affidavit were central to the probable cause determination that Railey had taken clandestine photographs of the

19

girls and a search warrant was needed to locate evidence of crime.  The
inference of illicit, surreptitious recording only arises when credit is given to
the false assertion that the pen camera had been disguised by placing it in a
specially modified toothbrush holder in the bathroom.  There can be no
doubt the state court judge understood from the  affidavit that the girls'
mother found a pen camera hidden in a specially modified toothbrush holder
which was located in the girls' bathroom.

*The false statements in the affidavit should be excised*

The Fourth Amendment protects "[t]he right of the people to be
secure in their persons, houses, papers, and effects, against unreasonable
searches and seizures." U.S. Const. amend. IV. Evidence seized as the result
of an illegal search may not be used by the government in a subsequent
criminal prosecution. *Franks v. Delaware,* 438 U.S. 154, 171 (1978).  The
exclusionary rule requires that if "…perjury or reckless disregard [in the
affidavit] is established by the defendant by a preponderance of the
evidence, and, with the affidavit's false material set to one side, the
affidavit's remaining content is insufficient to establish probable cause, the
search warrant must be voided and the fruits of the search excluded to the
same extent as if probable cause was lacking on the face of the affidavit."

*United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001), citing *Franks,* 438 U.S at 156.

The pen camera is mentioned only twice in the affidavit. The first instance is the demonstrably false assertion that "L.T. said she discovered an ink pen camera in her daughter's bathroom, and the ink pen camera was placed inside a toothbrush holder which was cut for better visibility." It was established at the suppression hearing that Thompson's affidavit contained a knowing false statement (that the modified toothbrush holder was located in the girl's bathroom and that the camera was placed inside it) and a recklessly made false statement (that the toothbrush holder had been cut to afford the camera better visibility). Once these false statements are set to one side, all that is left is that the mother found the pen camera in the girls' bathroom.

The second reference to the pen camera in the affidavit is the assertion that "L.T. said that she could not find the recording device for the ink pen camera and believes that Mr. Railey may have photographs of her children."

The mother's conclusion that Railey may have photographs of the children is unsupported when it is not buttressed by the misstatement that the pen camera was concealed in a specially modified toothbrush holder. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification

21

of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239(1983)

A bare bones affidavit will not support probable cause.

The district court erred in not excising from Thompson's affidavit the false statements. The failure to do so was clearly erroneous. The suppression issue should have been decided on *Franks* grounds and the motion to suppress granted because the balance of the indictment provided no probable cause for issuance of the warrant. The excised affidavit fails to "supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a 'safe yet accessible place.' " *United States v. Kapordelis,* 569 F.3d 1291, 1310 (11th Cir.2009). The inference that evidence of surreptitious video recording occurred arises only when the false assertions in the affidavit are credited as true.

*The Leon good faith exception is inapplicable*

The  district court was correct in finding that  the affidavit did not establish probable cause[3] because  grounds that "the affidavit provides no specific information to support the conclusion that the Defendant had taken with him either the missing pen camera recording device or any downloaded photographs". (Doc. 99 p. 7) While these defects in the search warrant

---

[3] The court also found that the warrant was overbroad. (Doc. 99 p. 8)

affidavit erode its probity, it is the false statements which should have been determinative, but they were never addressed.

The court determined that "…the warrant's failure to describe more specifically the items seized [did not] rendered the warrant so facially defective that Detective Thompson could not have believed it to be val*Id.* (*Id.* p. 10) Accordingly the court applied the *Leon's* good faith exception. *United States v. Leon,* 468 U.S. 897, 915, (1984)

The court erred in not recognizing from the suppression hearing testimony that Thompson, contrary to the assertions in the affidavit, knew L.T. did not find the pen camera placed in the toothbrush holder; knew L.T. did not find the toothbrush holder in the girls' bathroom; and knew, or was reckless (at best), in stating without any basis that the toothbrush holder was cut out to provide better visibility for the pen camera.

The good faith exception does not apply when the judge who issued the warrant was misled by the affiant. See *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir.), cert. denied, 537 U.S. 1076 (2002) The district court's legal conclusion that Thompson was entitled to the *Leon* good faith exception rests on the clearly erroneous factual finding that her statements in the search warrant affidavit were true. The suppression hearing testimony shows they were not.

23

The district court erred in failing to excise the false statements in the Thompson affidavit. Without those statements there was no probable cause.

## **CONCLUSION**

Because Railey's convictions rest exclusively on unconstitutionally seized evidence, they must be set aside.

                                    _____

                                    Arthur J. Madden, III
                                    MADDA0656
                                    Attorney for Appellant
                                    465 Dauphin Street
                                    Mobile, Alabama  36602
                                    251-432-0380

## **CERTIFICATE OF SERVICE**

     I hereby certify that I have on March 8, 2012 served a true and correct copy of the foregoing document by first-class mail, postage prepaid, properly addressed on:

Steven E. Butler, Esq.,
Assistant United States Attorney
63 South Royal St.
Suite 600
Mobile, Alabama  36602

                                      _____

                                    Arthur J. Madden, III